**DIPSON THEATRES, Inc. v. BUFFALO THEATRES, Inc., et al.**

Civ. A. No. 3058.

United States District Court
W. D. New York.

Sept. 27, 1949.

See, also, D.C., 8 F.R.D. 461.

Borins & Hoffman of Buffalo, N. Y. (Louis Borins and Dwight Campbell, Jr. of Buffalo, N. Y., of counsel), for plaintiff.

Raichle, Tucker & Moore, Buffalo, N. Y. (Frank G. Raichle, James O. Moore, Jr. of Buffalo, N. Y., and C. Stanley Thompson, of New York City, of counsel), for defendants Buffalo Theatres, Inc., Bison Theatres Corp., Loew's, Inc. and Paramount Pictures, Inc.

O'Brien, Driscoll, Raftery & Lawler, of New York City (Edward C. Raftery and George A. Raftery, of New York City, of counsel), for defendants Universal Film Exchanges, Inc., United Artists Corp. and Warner Bros. Picture Distributing Corp. (formerly called Vitagraph, Inc.

Sidney B. Pfeifer, of Buffalo, N. Y. and Dwight, Harris, Koegel, & Caskey of New York City (John F. Caskey, of New York City, of counsel), for defendant Twentieth Century-Fox Film Corp.

Sidney B. Pfeifer, of Buffalo, N. Y., and Harry M. Pimstein, of New York City, for defendant RKO Radio Pictures, Inc.

Schwartz & Frolich, of New York City (Louis D. Frolich, Everett A. Frolich and Max Rose, of New York City, of counsel), for defendant Columbia Pictures Corp.

Brown, Kelly, Turner & Symons of Buffalo, N. Y. (V. Edmund Kelly and John E. Leach, of Buffalo, N. Y., of counsel), for defendant Vincent R. McFaul.

KNIGHT, Chief Judge.

Plaintiff, in its amended complaint, sued 11 defendants, demanding $5,125,472 triple damages plus reasonable attorneys' fees for alleged violations of 15 U.S.C.A. §§ 1–7, 15 note (Sherman Act) and 15 U.S.C.A. §§ 12–27 (Clayton Act). Plaintiff alleged three causes of action. By order of this court, dated November 1, 1948, they were all dismissed as to defendant Columbia Pictures Corp. and the third cause of action was dismissed as to all defendants.

For brevity's sake, the following abbreviations will be used in naming the parties: Plaintiff will be named Dipson. The 10 remaining defendants will be named thus: Buffalo for Buffalo Theatres, Inc.; Bison for Bison Theatres Corporation; Vitagraph for Vitagraph, Inc.; Loew for Loew's Inc.; Paramount for Paramount Pictures, Inc.; RKO for RKO Radio Pictures, Inc.; Fox for Twentieth Century-Fox Film Corporation; Universal for Universal Film Exchanges, Inc.; United for United Artists Corp.; McFaul for Vincent R. McFaul.

Of these 10 defendants, three (Buffalo, Bison and McFaul) are sued as exhibitors —the remaining seven as distributors.

Plaintiff's first cause of action alleges unlawful discrimination against its Bailey Theatre, located at 2163 Bailey Avenue, Buffalo, N. Y. by defendant exhibitors, who operated it until August 1, 1939; that their lease expired July 31, 1939; that, on April 19, 1939, Dipson-Basil Theatres, Inc., which became Dipson Realty Co., Inc., purchased this theatre subject to the unexpired lease and operated it from August 1 to August 31, 1939, when D & B Operating Co., Inc., which by change of name became the plaintiff herein, leased it, began operating it on September 1, 1939, and has continued such operation. Plaintiff demands damages from September

1, 1939, to September 17, 1945 for "actual operating losses, based upon income from admissions * * * $19,115; and losses of net income * * * $126,878, totalling * * * $145,993." Par. 25.

Plaintiff's second cause of action concerns the Century Theatre, located at 511 Main St., Buffalo, N. Y., and the Riviera Theatre, located in Tonawanda, N. Y. It alleges that defendant exhibitors operated the Century for about 10 years prior to August 1, 1939, when their lease expired; that it was then leased for 10 years by Century Theatrical Enterprises, Inc., which took possession August 1, 1939, and operated both it and the Riviera until November 20, 1940, after which plaintiff operated both theatres until June 26, 1941, when lessee was forced by defendants to surrender both leases to the respective lessors. It is alleged that, on or about November 25, 1941, Century Theatrical Enterprises, Inc. assigned to plaintiff all its claims and causes of action against defendants. Plaintiff alleges that, during 23 months (August 1, 1939, to June 26, 1941), it and said Century Theatrical Enterprises, Inc. suffered an operating loss of $58,240.67, Par. 36, and, "except for the unlawful combination and conspiracy of the defendants," would have earned a net income between September 1, 1939, and August 31, 1949, of $1,423,788 Par. 36, from the Century and a net income between June 27, 1941, and July 31, 1949, of $56,570.60 from the Riviera, Par. 38.

Plaintiff alleges that "all of the defendants have combined and conspired to attempt to and to monopolize trade and commerce among the several States by securing to Defendant Exhibitors the sole and exclusive right to first-run and second-run of feature pictures at Buffalo, New York," in violation of sections 1 and 2 of the Sherman Act; that "the precise date or dates of origin of the said combination and conspiracy * * * are unknown to the plaintiff" but they "were in existence during the months of April through September, inclusive, 1939, having been formed prior to such period, and they have been in existence continuously since such period." Par. 17.

Plaintiff further alleges: "Such monopoly and restraint of trade have been accomplished, among other methods, by: contracts between Defendant Distributors and * * * Exhibitors granting special privileges to (latter) not available to the plaintiff, nor to other exhibitors; contracts between (them) making available to (Defendant Exhibitors) a supply of feature pictures far in excess of their reasonable needs, thus depriving the plaintiff and other exhibitors of the first-run and second-run of such features; contracts imposing unreasonable terms of run and clearance on plaintiff and other exhibitors for the benefit of Defendant Exhibitors; refusing to contract with plaintiff and other exhibitors for the purpose of preserving a monopoly to Defendant Exhibitors; permitting (latter) to move a picture from one theatre, when its run has been completed, to another theatre operated by them, for a so-called 'moveover' run, thus postponing all subsequent runs by plaintiff and other exhibitors, and reducing the revenue-producing possibilities of the picture at subsequent runs; threatening, and otherwise interfering and attempting to prevent the sale or lease to plaintiff or other exhibitors of theatres qualified to exhibit at first and second run in Buffalo; discriminating in film rentals by granting lower rentals to Defendant Exhibitors; contracts fixing minimum admission prices at subsequent run theatres for the purpose of preventing competition with Defendant Exhibitors." Par. 17.

It is alleged that "Defendant Exhibitors have attained a buying power which they exert to continue their monopoly and to restrain competition." Par. 18. There are many other allegations which will be cited in the body of this opinion.

Plaintiff admits in its brief: "There is no direct proof in the record of the existence of a conspiracy or an attempt to monopolize." Relying wholly on circumstantial evidence, it cites Interstate Circuit v. U. S., 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, and William Goldman Theatres v. Loew's, Inc., 3 Cir., 150 F.2d 738. In its reply brief, it leans heavily on Ball v. Paramount Pictures, Inc., 3 Cir., 169 F.2d 317. Witnesses who had charge of the firm dis-

tribution in this area testified for all the distributors that they did not participate in and knew of no monopoly or conspiracy to injure the plaintiff. McFaul so testified for the exhibitors.

■■ Plaintiff has the burden of establishing the alleged monopoly, conspiracy and restraint of trade. If the "proven facts give equal support to each of two inconsistent inferences", the plaintiff must fail. Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L. Ed. 819; Schad v. Twentieth Century-Fox Film Corp., 3 Cir., 136 F.2d 991, 996. Plaintiff must not only establish the fact of damages but must also offer sufficient proof of their amount. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 266, 66 S.Ct. 574, 90 L.Ed. 652; Twin Ports Oil Co. v. Pure Oil Co., D.C.D.Minn., 46 F.Supp. 149, 152.

The principal defendants in this action are the so-called "Shea Group", comprising McFaul, Paramount and Loew. Michael Shea in 1914 built the Hippodrome Theatre and opened it as the first modern moving picture theatre in the City of Buffalo. In 1920, Shea opened the North Park Theatre, the first modern neighborhood theatre in that city. Prior to 1925 the Shea business was locally owned and financed. In that year Famous Players Laskey Corp., predecessor of Paramount, became associated with him and the Buffalo Theatre was built. In 1934, upon the death of Michael Shea, defendant Buffalo was organized to take over the motion picture exhibition business founded and carried on by him during his lifetime. It has had 3 stockholders, Paramount, Loew and McFaul. The latter was a protege of Mr. Shea and ultimately became president of Buffalo, which had merged with Bison. He owns 40 shares of the 300 shares of Buffalo. Until October, 1940, he booked all the pictures and arranged all the runs for Buffalo. In that month these matters were taken over by Marcus Loew's Booking Agency, which maintains an office in New York City.

Nikitas D. Dipson, president of plaintiff Dipson and an experienced motion picture exhibitor, came to Buffalo in 1939 from Batavia, N. Y. and negotiated to purchase the Bailey Theatre and to lease the Century and Riviera Theatres. In that year he organized Century Theatrical Enterprises, Inc. and Dipson. The former leased the Century for a term of 10 years from its owner—Midland Properties, Inc. —and the Riviera for the same term from its owner—Smith Properties, Inc. By deed dated June 1, 1939, title to Bailey Theatre was acquired by Dipson-Basil Theatres, Inc., which by change of name became Dipson Realty Co., Inc. and was then leased to D & B Operating Company, which by change of name became the plaintiff Dipson.

After Mr. Dipson came to Buffalo in the early part of 1939, he negotiated with defendant distributors for films for the Century, Riviera and Bailey Theatres for the 1939–1940 season. He got all the films he wanted for the Riviera but contends that he did not get a sufficient quantity of first-run feature pictures for the Century and proper clearance at the Bailey ahead of Shea's Kensington Theatre.

Plaintiff claims no damage to the Riviera Theatre prior to the alleged forced surrender of the lease on June 26, 1941. It there had for exhibit on exclusive first run all the products of Loew, Paramount, Fox, RKO, United and Warner Bros. Pictures Distributing Corp., formerly called Vitagraph. During the operation of Century Theatre by plaintiff and its predecessor no pictures of Loew or Paramount were there shown. These defendants were majority stockholders in Buffalo and had a financial interest in the theatres operated by Buffalo. Their witnesses admitted that they favored their own theatres. It does not appear that Loew or Paramount are financially connected in any way with any of the other five defendant distributors or that these are interested in Buffalo's theatres, except that Buffalo was an old customer. Defendants Universal, Vitagraph and United in their brief cite many cases in support of the proposition that a distributor has the legal right to select its own customers and

to deal or not deal with any customer as it sees fit. Among these citations is Federal Trade Commission v. Paramount, Famous-Lasky Corp., 2 Cir., 57 F.2d 152, where the court said: "A distributor of films * * * has the right to select his own customers and to sell * * * or to refuse to sell at all to any particular person for reasons of his own." 57 F.2d at page 156. Defendants Fox and RKO in their brief also stress the right of a distributor to do business with whom it pleases in the exercise of its own judgment and cite many cases.

The general rule and its exception are well stated in Binderup v. Pathe Exchange, 263 U.S. 291, at page 312, 44 S.Ct. 96, at page 100, 68 L.Ed. 308, in these words: "It is doubtless true that each of the distributors, acting separately, could have refused to furnish films to the exhibitor without becoming amenable to the provisions of the act, but here it is alleged that they combined and conspired together to prevent him from leasing from any of them. The illegality consists, not in the separate action of each, but in the conspiracy and combination of all to prevent any of them from dealing with the exhibitor."

Plaintiff urges that the seven defendant distributors did not act independently and that the evidence discloses that Vitagraph, RKO, Fox, Universal and United were dominated by the powerful "Shea Group", comprising Loew, Paramount and McFaul, so that plaintiff suffered financial loss at its Century and Bailey Theatres. The evidence however discloses that at the Century it got all of RKO's first-run feature pictures with the exception of one picture —Pinocchio—and all of RKO pictures it requested at the Bailey to be shown immediately after the run at Buffalo's competing Kensington Theatre. At the Century it also got about one half (18 pictures) of the Warner (Vitagraph) product. It cliams that this was not enough for successful operation; that in consequence of defendants' conspiracy and monopoly it lost money at the Century and the lessee was forced to surrender the lease, which was tied up with the Riviera lease, which also had to be abandoned at the same time.

Plaintiff offered no proof that the two leases were interrelated. There is no reference in one lease to the other. The two landlords were wholly independent corporations. The only connection between them is that one Max Yellen was president or the Riviera landlord corporation and general manager of the Century corporate landlord. He served a notice to vacate the Century for non-payment of rent. Thereafter, according to witness Nikitas D. Dipson, he offered a choice of three alternatives: (1) pay the back rent, (2) being evicted and "having the total amount of the rent of the Century, as well as the Riviera becoming due", (3) that "if we surrendered the lease of the Century we would be given credit in the amount of $10,000, which was the rent deposit for that theatre, and whatever was owned over and above that we were to pay and we were also to surrender the Riviera Theatre." Max Yellen, however, testified that before this proposition was made N. D. Dipson came to him and said he wanted to surrender both leases. Dipson did so and got a credit of $10,000 on the Century indebtedness. He tried repeatedly thereafter to lease the two theatres again but did not succeed. Whatever his motives may have been, he was not legally obliged to surrender the Riviera lease. There is no evidence that Max Yellen was agent of any of the defendants. They should not be held liable for any loss to plaintiff resulting from the Riviera lease surrender.

Did defendants compel surrender of the Century lease?

The Century was built in 1920-1921 and was originally operated as a combination vaudeville and motion picture theatre. It made a profit until Buffalo opened its Buffalo and Great Lakes Theatres. Buffalo, having lost substantial money in the Century in 1938-1939, declined to pay the increased rent asked by the landlord and renew the lease. It was then leased to Century Theatrical Enterprises, Inc. for a term of 10 years beginning August 1, 1939.

The minutes of a special meeting of the board of directors of the latter corporation, held on June 30, 1941, disclose that its president, N. D. Dipson, presented audit

reports showing a loss in the Century operation from August 1, 1939, to December 31, 1939, of $23,345.26; from January 1, 1940, to November 20, 1940, of $10,155.73; from November 21, 1940, to December 31, 1940, of $7,990.95; from January 1, 1941, to May 31, 1941, of $6,453.76. He also reported a loss during June, 1941, but did not state the amount. He also told the board of directors "that in his opinion, the company was not in a position to further continue to make good the losses in the operation of the Century ˙ * * *, and that accordingly he recommended * * * that the unexpired term of the lease covering the * * * Century * * *, and the unexpired term of the lease covering the Riviera * * * be surrendered to the respective lessors, effective immediately."

The same minutes disclose these losses at the Riviera in 1941—March—$1,228.27; April—$287.97; May—$508.44.

The minutes then recite: "There was considerable discussion by the directors with reference to the losses sustained by the company in the operation of the * * * Century * * *, and with reference to the operation of the Riviera * * *, particularly as to the problem of further contributions by the stockholders to meet the losses sustained in the past, and to meet the losses which the Board of Directors felt would be sustained in the future in the operation of the * * * Century * * *, particularly so because of the puzzling drop in theatre attendance throughout the country, which this year became apparent in the months of April and May, fully two months earlier than the usual summer slump; that the movie industry was unable to explain why the people were staying away from the movies in face of increased employment and national defense spending."

It was then resolved to terminate both leases, Andrew Gibson, who signed these minutes as secretary of Century Theatrical Enterprises, Inc., testified thus on cross-examination:

"Q. The facts and circumstances causing the surrender of the lease are those recorded in the minutes, is that correct? Yes or no. A. Yes, sir.

"Q. As a matter of fact, Mr. Gibson, you and Dipson decided apropos of the drop in business throughout the country to seek a rent reduction from Yellen or the Midland Properties, didn't you? A. When?

"Q. In the spring of 1941. A. I think we had during the winter, too; both times."

In these corporate minutes there is no mention of any loss caused by defendants' conduct. Plaintiff did not commence this action until September 17, 1946, more than 5 years after the leases were surrendered.

Plaintiff, in its amended complaint, alleges that "on or about November 25, 1941, said Century Theatrical Enterprises, Inc., for good and valuable consideration, duly assigned to the plaintiff all of its right, title and interest in and to its claims and causes of action against the defendants arising from the unlawful conduct of the defendants with respect to said assignor's operation of said Century and Riviera Theatres, and plaintiff is now the sole owner of said claims and causes of action." Par. 31.

The minutes of a special meeting of the stockholders of said corporation held November 25, 1941, disclose the following three resolutions:

"Resolved, that the corporation dissolve * * *

"Resolved, that the President and Secretary be, and they hereby are, directed to execute the necessary papers to effect a dissolution * * *

"Resolved, that all of the company's assets including all available property, deposits of every nature and description, and the accounts receivable from Dipson Realty Co., Inc. be transferred to Dipson Theatres, Inc., in cancellation of the company's obligation to Dipson Theatres, Inc., and in consideration of the payment by Dipson Theatres, Inc., of such obligations of the company which Dipson Theatres, Inc., deems necessary to pay in order to continue its own operations of theatres in Buffalo and Western New York."

. The certificate of dissolution, executed December 1, 1941, was filed December 11, 1941.

The minutes also contain this sentence: "The President (N. D. Dipson) reported that the company had discontinued doing business in the city of Buffalo and that it was advisable at this time to dissolve the corporation, and to dispose of the remaining assets of the company."

Max Yellen, general manager of the Century landlord, sworn by plaintiff, testified thus on cross-examination:

"Q. Mr. Yellen * * * Did you have a conversation with Mr. Dipson at the time of the surrender of the lease, with respect to the disposition of the assets of the Century Theatrical Enterprises, Inc.? * * * A. Yes, sir. * * *

"Q. Will you tell us what that conversation was? A. Well, the conversation was that all of the assets of the company, with the exception of the office equipment and office improvements and office furnishings of Century Theatrical Enterprises in the Main Street offices that they occupied were to go to the landlord.

"Q. Midland Properties? A. That's correct. * * *

"Q. And, as I understand it, Mr. Dipson stated that, and you agreed to it? A. That is right."

N. D. Dipson was not called to rebut this testimony.

■ Plaintiff's counsel have admitted that there was no written assignment of the claims of the Century corporation against defendants but insist it was oral. In their reply brief they say: "There was no assignment on a stationer's blank, but the minutes adequately record the decision reached. There is no proof that after agreement on the point Mr. Dipson, as president of Century Theatrical, rose to his feet and said, 'I hereby assign all of Century's assets to Dipson Theatres,' nor that Gibson or someone else as an officer of the plaintiff then rose to his feet and said, 'I hereby accept on behalf of Dipson Theatres, Inc.' Mere suggestion of any such performance shows how unnecessary it was. Agreement had been reached by the parties concerned and that agreement was put into effect, as subsequent book entries demonstrate."

William Smith, C. P. A., sworn by plaintiff, testified thus on cross-examination: "Q. Is there any entry on the books of Century Theatrical Enterprises Inc., recording the fact of the cancellation of a debt due from Century Theatrical Enterprises, Inc., to Dipson Theatres, Inc., in the sum of thousands and thousands of dollars due and owing on November 25, 1941? Yes or no. A. There was no such entry."

Plaintiff failed to prove the assignment alleged in the 31st paragraph of its amended complaint.

Plaintiff urges that, regardless of assignment, it is entitled to recover "damages sustained in its effort to operate the Century between November, 1940 and June, 1941." Dipson made an agreement with the Century corporation, dated November 18, 1940, and effective November 20, 1940, to operate the Riviera and Century Theatres, to pay all operating expenses and retain all income. The minutes of a special meeting of the Century board of directors held June 10, 1941, recite: "The President read to the Board of Directors a notice, dated June 10, 1941, served upon the company, terminating the agreement, dated November 18, 1940, entered into between the company and D. & B. Operating Co., Inc., now known as Dipson Theatres, Inc., as of midnight June 26, 1941." It was resolved that the notice be filed in the minute book.

The minutes of the Century corporation's meeting of its board of directors on June 30, 1941, disclose that a C. P. A. audit report showed there was a loss in the Century operation from November 20, 1940, to December 31, 1941, of $7,990.95 and from January 1, 1941 to May 31, 1941, of $6,453.-76. There is no evidence of what the loss was between June 1–27, 1941.

Plaintiff's witness William Smith, C. P. A., presented three different estimates of damages sustained in the operation of the Century Theatre from August 1, 1939, to July 31, 1949, being the period of the 10 year lease. These are the amounts claimed in each: (1)—$630,943; (2)—$984,626; (3)—$1,423,788. The last is the amount of damage claimed for the Century in plaintiff's amended complaint. Par. 36. None

of Smith's three computations estimate the damage suffered by plaintiff between November 20, 1940, and midnight June 26, 1941, and plaintiff offered no specific proof on this matter.

■ Plaintiff's second cause of action concerning the Century and Riviera Theatres must be dismissed for failure to establish any damages. This leaves for consideration plaintiff's first cause of action dealing with the Bailey Theatre.

■ The first cause of action alleges that while the Bailey and Kensington Theatres were operated by defendant exhibitors until August 1, 1939, they "had the same run, that is thirty (30) days after first run in the downtown Buffalo theatres. In practice, Defendant Exhibitors showed the more profitable pictures at the Bailey * * * first and showed such pictures at the Kensington from four (4) to eleven (11) days after the completion of the Bailey * * * showing." Par. 20, That, on April 19, 1939, Dipson-Basil Theatres, Inc. purchased the Bailey, that defendant exhibitors became aware of this and, not later than April 24, 1939, "immediately changed their operating policy as to the two theatres", advertised this change "and, on May 7, 1939, put it into effect by showing 'A' features at the Kensington ahead of the Bailey. This practice was promptly extended to all features, and was continued during the remainder of the term of (their) lease of the Bailey Theatre." Par. 22.

Paragraph 23 makes specific charges against the several defendants as follows: "Twenty-Third: In negotiating contracts for features at the Kensington * * * for the 1939–1940 and subsequent seasons, Defendant Exhibitors demanded a clearance in favor of the Kensington over the Bailey Theatre. By contract they obtained a clearance of * * * (7) days over the Bailey * * * from defendants (Loew, Paramount, RKO, Universal and United). For the seasons 1939–40 and 1940–41 defendant (Vitagraph) contracted to furnish half of its features * * * to the Kensington * * *, with a clearance of (7) days over the Bailey * * * and to furnish the remaining half to the Bailey * * * with a clearance of * * * (7) days over the Kensington * * *. After October 1942, this system of 'splitting' product was terminated and at all subsequent times (it) imposed a clearance in favor of the Kensington * * * against the Bailey * * *. By contract with defendant (Fox) for the seasons 1939–40 and 1940–41, the Bailey * * * was to obtain film immediately after the run at the Kensington * * *, but in practice (it) delivered film to the Bailey only upon a clearance of * * * (4) days after the Kensington * * * run * * *."

The remaining allegations are directed against Columbia Pictures Corporation but all three causes of action against that defendant were dismissed by order of this court granted November 1, 1948.

Plaintiff's counsel in their brief make this admission: "Undoubtedly, as a consequence of the identity of contract terms, McFaul had a right to request that all pictures be booked into the Kensington ahead of the Bailey so long as he operated both houses, but there was no excuse or right after he ceased to operate the Bailey."

The Kensington was built in 1926 and the Bailey in 1928.

Defendant Vincent R. McFaul, called as a witness by plaintiff, testified that Shea opened the Kensington in 1926 under some contracts with distributors worded "First run east of Main Street"; that about two years later, Shea began to operate the Bailey, situate 1.7 miles south of the Kensington. McFaul said: "When the Bailey Theatre opened * * * we asked permission of the companies to transfer some of the pictures into that theatre ahead of the · Kensington * * *. We asked to play a few of them ahead of our own contract. They gave us permission to. We then continued playing on that basis until the Bailey was turned over to someone else. At that time we then moved the pictures back, asked how many pictures we could take back, and we took them all back." In 1936, the better pictures were played about 50-50. McFaul said: "I think as we went into 1937–1938 we played more of the better Sunday pictures at the Ken-

sington first." This was done in 1938 and during the period from January 1 to May 1, 1939.

Plaintiff offered official evidence of a steady population increase in the vicinity of the Kensington and a decrease in the Bailey vicinity during this period. Exhibits 43 and 44. There is no evidence that more than a part of defendant exhibitors pictures were ever played on a prior run at the Bailey.

D. & B. Operating Co., Inc., which by change of name became Dipson, leased the Bailey and began operating it September 1, 1939, and plaintiff demands damages for losses from that date until September 17, 1945, in the total of $145,993. Par. 25. These were not absolute losses as in the case of the Century operation from November 20, 1940, to June 27, 1941, where plaintiff went into the red. Plaintiff made some profit during said interval at the Bailey but claims it would have profited more on prior runs, of which it was deprived by defendants' monopoly and conspiracy.

15 U.S.C.A. § 15 provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

No defendant in this case has objected to the court's jurisdiction.

15 U.S.C.A. § 12 provides: " 'Antitrust laws,' as used in sections 12, 13, 14–21, 22–27 of this title, includes sections 1–27, inclusive, of this title."

Section 1 of said title declares: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States * * * is hereby declared to be illegal."

Section 2 declares: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed guilty of a misdemeanor * * *."

"The common law doctrines relating to contracts and combinations in restraint of trade were well understood long before the enactment of the Sherman law. They were contracts for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like practices, which tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market. * * * Certain classes of restraints were not outlawed when deemed reasonable, usually because they served to preserve or protect legitimate interests, previously existing, of one or more parties to the contract.

"In seeking more effective protection of the public from the growing evils of restraints on the competitive system effected by the concentrated commercial power of 'trusts' and 'combinations' at the close of the nineteenth century, the legislators found ready at their hand the common law concept of illegal restraints of trade or commerce. In enacting the Sherman law they took over that concept by condemning such restraints wherever they occur in or affect commerce between the states. They extended the condemnation of the statute to restraints effected by any combination in the form of trust or otherwise, or conspiracy, as well as by contract or agreement, having those effects on the competitive system and on purchasers and consumers of goods or services which were characteristic of restraints deemed illegal at common law, and they gave both private and public remedies for the injuries flowing from such restraints." Apex Hosiery Co. v. Leader, 310 U.S. 469, at pages 497–498, 60 S.Ct. 982, at page 994, 84 L.Ed. 1311, 128 A.L.R. 1044.

In the case of sales, 15 U.S.C.A. § 13(a) expressly provides: "That nothing contained in sections 12, 13, 14–21, 22–27 of this title shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own cus-

tomers in bona fide transactions and not in restraint of trade."

In Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46, 49, the court said: "Before the Sherman Act it was the law that a trader might reject the offer of a proposing buyer, for any reason that appealed to him; it might be because he did not like the other's business methods, or because he had some personal difference with him, political, racial, or social. That was purely his own affair, with which nobody else had any concern. Neither the Sherman Act, nor any decision of the Supreme Court construing the same, nor the Clayton Act, has changed the law in this particular. We have not yet reached the stage where the selection of a trader's customers is made for him by the government."

In United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992, 7 A.L.R. 443, the Supreme Court said: "In the absence of any purpose to create or maintain a monopoly, the (Sherman Act) does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."

See also Brosius v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99, 101–102; Green v. Victor Talking Mach. Co., 2 Cir., 24 F.2d 378, 382, 59 A.L.R. 1091. In the latter case, the court said: "A private trader is privileged to exercise his own pleasure as to parties with whom he will deal. * * * To make his motive in exercising this privilege the subject of judicial inquiry would be a step beyond what the courts have yet done, or what we think they can wisely do in the present stage of our economic order."

This doctrine was applied to motion pictures in Westway Theatre, Inc., v. Twentieth Century-Fox Film Corp., D.C.D. Md., 30 F.Supp. 830, affirmed on opinion of court below, 4 Cir., 113 F.2d 932, where the court said: "Furthermore it is clearly the established law that the distributors have the right to select their customers * * * and therefore the plaintiff has no absolute right to demand exhibition rights for the pictures of any of the distributors." 30 F.Supp. at pages 836–837.

The Westway case is distinguished in Ball v. Paramount Pictures, 3 Cir., 169 F.2d 317, which plaintiff's counsel quote at length in their reply brief. The court said, 169 F.2d at page 321: "Westway concerned a peculiarly local situation in Baltimore. It was a suit by an owner of a new theatre. His neighboring competitors sought clearance protection in their already existing contracts with their distributors, and this was allowed. It was held not an unreasonable restraint of trade because it amounted to the protection of existing customers as permitted at common law. No evidence tending to show conspiracy was observed by the court. As seen, the comparison between the matter before us and Westway is neither close nor controlling where, as here, the conspiracy of appellees is so apparent."

From the opinion in the Ball case, 169 F.2d at page 319, it appears that plaintiff for himself and family bought the Penn Theatre in Ambridge, Pa. Defendant Pennware Theatre Corp. held a lease on it, expiring April 30, 1944. "Pennware's capital stock was owned one-half by * * * a wholly owned subsidiary of (defendant) Paramount Pictures, Inc., and one-half by (defendant) A. N. Notopoulos, who operates a chain of motion picture theatres in the area. For at least ten years preceding the expiration of the lease, Pennware had been licensed to exhibit all of Paramount Film Distributing Corporation's feature motion pictures first run at the Penn Theatre and one-half of the feature motion pictures first run of (defendants) R. K. O., Loew's and Twentieth Century-Fox. Negotiations for renewal of the lease failed to produce an agreement between the parties and the lease was not renewed. Meanwhile (defendant) Pennware was busy reconverting a garage property into a theatre * * * thereafter named the State.

"Pennware had vacated the Penn Theatre by April 30, 1944. Under its lease it was entitled to remove its furnishings and equipment. (Plaintiff) contends that in doing this (it) deliberately did what it

could * * * to wreck the theatre. While the negotiations for the renewal of the lease were proceeding, (plaintiff) talked with Mr. Goldenson, vice president of (defendant) Paramount Pictures, Inc., in charge of his company's theatre interests. * * * tried to persuade (him) that (if) the parties could not agree on a renewal of the lease, it would be unfair for Paramount to move its products from the Penn Theatre or to do anything to get the other film companies to do likewise. According to Ball, Goldenson said that after the Pennware lease was terminated, the product which the Penn Theatre had enjoyed would be given over to the new theatre Paramount, Pennware and Notopoulos were building; none of the first run Paramount product would go to the Penn Theatre unless the lease was renewed; and, as to the other producers, he would use the power of Paramount to see to it that their product went to the new theatre they were building.

"Following the termination of the lease with Pennware and the removal by the latter of its property, (plaintiff) had his theatre repaired and re-equipped. This was completed by June 23, 1944. He was, however, then or thereafter unable to obtain any first run pictures either from Paramount or from any of the other distributor (defendants), and this despite the fact that he was willing to agree to terms which would have been far more favorable to the distributors than those which they had received previously from Penn Theatre showings. All the first run of the pictures of (defendant) which, under the Pennware regime, had been displayed at the Penn Theatre was transferred to the State Theatre at the request of Pennware."

The District Court, 67 F.Supp. 1, 11, had found that "each distributor acted independently without consulting any other distributor and without concert of action. No representative of Paramount had any active part in obtaining such licenses." The appellate court held that a conspiracy could be inferred, reversed the decree and remanded the cause to determine the amount of plaintiff-appellant's damages. Goodrich, J., however, wrote a long dissenting opinion ending with this sentence:

"We should not substitute a hunch, however judicial, for facts advertently found." 169 F.2d at page 324.

In the instant case there is no evidence of any threat to deprive plaintiff of any first-run features at the Century or prior showings at the Bailey and no evidence that plaintiff offered any of the distributor defendants more favorable terms than its competitor. Plaintiff did, at the Century, get all of RKO's first-run features, except one picture, and one-half of Warner's (Vitagraph). Its lessee took over a run-down theatre, which required about $50,000 repairs. Buffalo had lost money on the Century during the two years prior to the expiration of the lease and declined to renew it.

The two further cases relied on by plaintiff's counsel can be distinguished. In Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, a suit brought by the Government under the Sherman Act, the court said: "The trial court drew the inference of agreement from the nature of the proposals (contained in a letter printed at pages 216–217 of 306 U.S., at pages 469–470 of 59 S.Ct.) made on behalf of Interstate and Consolidated; from the manner in which they were made; from the substantial unanimity of action taken upon them by the distributors; and from the fact that appellants did not call as witnesses any of the superior officials who negotiated the contracts with Interstate or any official who, in the normal course of business, would have had knowledge of the existence or non-existence of such an agreement among the distributors." 306 U.S. at page 221, 59 S.Ct. at page 472.

The court further said: "Taken together, the circumstances of the case * * *, when uncontradicted and with no more explanation than the record affords, justify the inference that the distributors acted in concert and in common agreement in imposing the restrictions upon their licensees in the four Texas cities. This inference was supported and strengthened when the distributors, with like unanimity, failed to tender the testimony, at their command, of any officer or agent of a distributor who knew, or was in a position to know, whether

in fact an agreement had been reached among them for concerted action." 306 U.S. at page 225, 59 S.Ct. at page 474.

In the instant case such denials were emphatically made by all the defendant distributors and by defendant Vincent R. McPaul.

In William Goldman Theatres v. Loew's, Inc., 3 Cir., 150 F.2d 738; Id., 3 Cir., 164 F.2d 1021, certiorari denied 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742, plaintiff in 1940 decided to enter the first-run business and leased the Erlanger Theatre in Philadelphia, Pa. for 10 years at an annual rental of $12,000. The court said concerning the Erlanger: "Its appointments are quite as elegant as any of those of the Warner theatres. As to management, reputation and in all other respects, the Court below found, (it) was suitable for profitable exhibition of first-class feature motion pictures on first-run in competition with the theatres operated by Warner Brothers. * * * After leasing the Erlanger plaintiff made repeated requests to the distributor defendants to lease feature pictures for first-run exhibition upon offers to pay much higher prices for pictures than the distributors had been receiving from Warner Brothers. (He) was able to offer such prices because of the favorable terms found in its lease. But, distributor defendants refused and still refuse to lease any of such pictures to plaintiff for first-run exhibition. Plaintiff put interrogatories to the defendants in order to ascertain their reason for such uniform exclusion. Fox stated that its arrangement with Warner Brothers gave it 'economic advantage.' RKO and Loew's stated a similar arrangement was 'more advantageous'. Paramount said its agreement with Warner Brothers was 'desirable,' while Columbia put the arrangement on the basis it was 'very satisfactory.' * * * The Court below then found the distributor defendants had refused to lease pictures to plaintiff at the Erlanger theatre solely because that theatre was not under the control of Warner Brothers; but if it had been a Warner's theatre they would have leased plaintiff the pictures it sought." 150 F.2d at page 742.

The court further said: "We conclude that where a person has an available theatre to exhibit first-run pictures in a city of some two millions of people, where such business draws receipts in the many more millions of dollars each year, where the pubic has a live interest in the recreation, education and informative services which this new art form furnishes, a course of conduct, by those who own all of the other available theatres in that area, and those who distribute the product, which eliminates from competition the owner of the available theatre, constitutes a violation of the statutes." 150 F.2d at pages 743-744.

It appears in that case that Warner Bros. on September 4, 1942, reopened its Mastbaum Theatre one block away from Plaintiff's Erlanger and since then "the receipts have amounted to approximately $1,000,000 a year." 150 F.2d at page 742.

The court also said: "Uniform participation by competitors in a particular system of doing business where each is aware of the other's activities, the effect of which is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the statutes before us." 150 F.2d at page 745.

On review, the Circuit Court said: "We are of the opinion now, as we were of the opinion then, that the principles of Interstate Circuit v. United States, 306 U.S. 208, 225, 227, 59 S.Ct. 467, 83 L.Ed. 610 * * *, rule the case at bar." 164 F.2d 1022.

In 306 U.S. at page 227, 59 S.Ct. at page 474, the court said: "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. * * * Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."

In the instant case there is no evidence that plaintiff offered to pay defendant exhibitors "much higher prices for pictures" than the Shea group or that any of the de-

fendants invited or encouraged the others "to participate in a plan." The Century was an old theatre when Buffalo let its lease expire and required substantial repairs before it could operate. The Bailey and Kensington Theatres are 1.7 miles apart. Before Buffalo gave up the Century, defendant distributors preferred and sometimes insisted that their pictures be played in Buffalo's Hippodrome, Great Lakes or Buffalo Theatres for first run. Moreover the Kensington-Bailey clearances were not in uniform after the Dipson interests acquired the Bailey.

As to the Bailey Theatre, plaintiff in its amended complaint claimed a total loss of $145,993 between September 1, 1939, and September 17, 1946, the date of the commencement of this action. This is based on the estimate of its witness William Smith, C.P.A. At the trial an error in arithmetic was disclosed in this estimate and plaintiff's counsel in their brief state that the corrected amount of damage is $145,228.

This Smith estimate is based on the ratio of Bailey admissions for "1938 Last full year operated by Shea $143,214" to "1940 First full year operated by Dipson $110,-098." The first is 130.08% of the last. The actual admissions at the Bailey are given in eight periods—9/1–12/31/39, 1940–1945, inclusive, and in 1946 to September 17. 130.08% of each is figured as the estimated admissions for each period. The estimated film rent is based on the ratio of the actual film rents and admissions and each estimated admission is multiplied by this ratio, which varies between the limit of 26.59% and 41.27%. The estimated operating expenses are based on the actual amounts for rent and C.O., which witness Smith said means contact office or general office expense. Counsel for defendants strenuously contested the probative value of this estimate. It assumes that the ratio of film rent to the admissions for a given period would be the same if the actual admissions were increased 130.08% for the same period and that the estimated operating expenses for a given period would be the same as the actual expenses plus the

small addition of actual rent and C.O. for the same period.

This basis of computing damages differs entirely from either of the two methods sanctioned in Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, which are thus summarized in the syllabus: "One was a comparison of earnings during the 5-year period of petitioners' theatre with those of a comparable theatre of the respondents, which showed a difference of nearly $116,000 in favor of the latter. The second was a comparison of the receipts of petitioners' theatre for the five years following July 1937 with the receipts for the four years immediately preceding, which showed a decline aggregating more than $125,000."

The evidence discloses that plaintiff played all of Columbia Pictures Corp. and one-half of the Warner (Vitagraph) pictures at the Bailey ahead of the Kensington. Universal pictures were available to plaintiff for exhibition ahead of the Kensington but it did not license them.

Defendants offered in evidence, Exhibits 47 and 48, a complete list of all pictures played at the Kensington ahead of the Bailey and the converse from August 18, 1939, to August 27, 1946. Defendants' Exhibit 47 lists 127 pictures that played the Kensington ahead of the Bailey with a unit total of $32,764.32 and an average unit gross of $258 received at the Bailey. It lists 128 pictures that played the Bailey ahead or clear of the Kensington with a unit total of $27,302.58 and an average gross of $213.30 received at the Bailey. Defendants' Exhibit 48 lists the same pictures but with a different mode of computation, which is thus summarized: "Pictures played clear or ahead of Kensington Theatre: 508 units for a total gross of $112,124.76—average unit gross—$220.72. Pictures played after Kensington Theatre: 3,221 units for a total gross of $743,664.80 —average unit gross—$230.88."

There are further grounds impeaching the probative value of the Smith estimate. During part of the time, including the year 1940, that plaintiff operated the Bailey Theatre, it suffered loss in competition with

the Genesee Theatre, operated by plaintiff's former partner Nicholas J. Basil. In a letter from N. D. Dipson to said Basil, dated February 4, 1942, Dipson wrote: "4th. As you know, we paid $255,000.00 to purchase the Bailey Building with the assumption that this theatre will always operate on a 21 days clearance over the Genesee. You also know that we went to trouble and expense to reestablish the Bailey run, and if you followed the arbitrators proceedings you would have known by now that it was proven beyond doubt that because of that change at the Bailey, the Bailey has lost $500.00 a week gross, and that it was also proven in my opinion that half of this gross was lost to the Genesee, because in some instances after the change, the Genesee has received and operated on a 14 days clearance instead of 21."

Dipson testified: "I don't recall writing the letter." Defendants' witness Samuel L. Yellen testified that this letter was delivered to him by Dipson, who "wanted to show me what he had written to Mr. Basil * * *.

"The Court: Well, did he say he sent the letter to Basil?

"The Witness: Yes, sir."

Dipson did not rebut this testimony.

Nikitas D. Dipson, plaintiff's president, testified on cross-examination as follows:

"Q. In the Bailey Theatre you claim that because of this conspiracy you lost $145,000, is that right? A. That's what I did claim in my complaint.

"Q. Do you still claim that? A. Yes.

"Q. Do you claim that all of that $145,000 loss was sustained by reason of this conspiracy?" Objection was made and overruled and the question then put in another form.

"Q. Do you claim that there are any other causes or reasons why you lost this money in the Bailey Theatre? A. I wouldn't know.

"Q. You don't know? Is that your answer? A. Yes."

Witness was then questioned at length about an arbitration proceeding brought by the Genesee Theatre against Bailey Theatre to reduce the clearance.

"The Court: Can you state how much you include in your cause of action from damages arising out of the change of clearance between the two theatres?

"The Witness: I don't know, your Honor."

In the Genesee-Bailey arbitration proceeding, witness Dipson testified that if there was a further reduction in clearance "we couldn't continue operating, in the first place, under the same price of admission * * *. Because we would want the people to come to us before the picture is played, a considerable time before the picture is played at the Genesee for a nickle more (this obviously should read "less").

"The Arbitrator: The receipts of the Bailey Theatre would be considerably and substantially reduced?

"The Witness: Much less.

"The Arbitrator: Would it be reduced to a point where you could not operate at a profit.

"The witness: Definitely."

Andrew Gibson, secretary-treasurer and stockholder of plaintiff corporation, sworn on behalf of plaintiff, testified on cross-examination about the Genesee-Bailey arbitration proceeding as follows:

"Q. At page 369 of the record in the Genesee-Bailey case, line 14, your counsel stated, did he not, 'Here are 12 months of 1940?' Is that right? A. Yes.

"Q. And you were talking about violations of clearance, is that right? A. Yes, sir.

"Q. On the next page at line 5 were you asked 'What is the number of violations for January?' and did you answer as follows '13. For February 11. For March, 1940, 13. For April, 1940, 11. For May, 1940, 10. For June, 10. For July, 1940, 8. August, 1940, 3. September, 1940, 6. October, 1940, 2. November, 1940, 3. December, 1940, 3'? A. I so stated.

"Q. And would you accept my assurance that that totals 93 violations, or would

you like to add them? A. No, I will accept your figure.

"Q. And that was a true and correct statement of the situation, and that was the fact, was it not, as you testified to? A. As I found it.

"Q. That was the truth as you testified to it? A. Yes, sir."

When Nikitas D. Dipson and Nicholas Basil acquired the Bailey Theatre in 1939, the latter operated and supervised the management of both the Bailey and Genesee Theatres. Basil or his family owned 50% of the Bailey but wholly owned the Genesee. Witness Dipson admitted that he gave the following testimony in the Genesee-Bailey arbitration proceeding:

"Q. Along about 1940 some difference arose between you and the Basils about the operation of the Bailey? A. That is right.

"Q. What did that concern? A. Well, the Basils had shown some how to favor the Genesee Theatre by repeatedly waiving the clearance for the benefit of the Genesee.

"Q. Waiving after the Bailey in favor of the Genesee? A. For the benefit of the Genesee."

On cross-examination he further admitted:

"Q. Now, Mr. Dipson, did you at that time believe that the waiver of reduction of clearance between the Bailey and the Genesee was damaging your business?

"Mr. Raichle: At the Bailey?

"Mr. Pfeifer: At the Bailey.

"The Witness: Yes.

"Q. You did so believe? A. Yes."

Plaintiff's accountant Smith in computing the receipts at the Bailey Theatre in 1940 did not take into account the 93 Genesee violations of clearance in that year. He said on cross-examination:

"A. The factors were not the same in 1940 as in 1938.

"Q. What factors were different—and name each one—assumed by you to be different in 1940 than they were in 1938 and upon which this exhibit depends? A. The prime factor was that the Bailey played the pictures ahead of the Kensing-ton in 1938, and in 1940 the Kensington played more pictures ahead of the Bailey.

"Q. Except for that factor you assumed conditions in 1940 and 1938 to be similar and comparable, didn't you? A. Yes, sir * * *.

"Q. You assumed all the other factors to be the same or substantially similar; is that correct? A. Yes."

Plaintiff has failed to establish any violation by defendants of the Sherman or Clayton Acts as alleged in the amended complaint and has also failed to give satisfactory proof of damages. The first and second causes of action of the amended complaint must be and are dismissed as to all the defendants. Findings may be submitted to accord with this opinion.