BALL v. PARAMOUNT PICTURES, Inc., et al.

No. 9233.

Circuit Court of Appeals.
Third Circuit.

Argued Nov. 6, 1947.
Decided July 21, 1948.
Rehearing Denied Oct. 13, 1948.

318

GOODRICH, Circuit Judge, dissenting.

———————◆———————

Joseph W. Henderson, of Philadelphia, Pa. (Rawle & Henderson, of Philadelphia, Pa., and Thorp, Bostwick, Reed & Armstrong, and Roy G. Bostwick, all of Pittsburgh, Pa., on the brief), for appellant.

Bernard G. Segal, of Philadelphia, Pa., (Wm. A. Schnader, John E. Mulder, and Schnader, Kenworthey, Segal & Lewis, all of Philadelphia, Pa., on the brief), for appellees Paramount Pictures, Inc., and others.

John G. Buchanan, of Pittsburgh, Pa., (David B. Buerger and Smith, Buchanan & Ingersoll, all of Pitsburgh, Pa., on the brief), for appellee Loew's Inc.

James H. Beal, of Pittsburgh, Pa., (James R. Orr and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., on the brief), for appellees Pennware Theatre Corporation and another.

Before BIGGS, GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a conspiracy suit under the Sherman and Clayton Acts.[1] Plaintiff-appellant is the owner and operator of the Penn motion picture theatre in Ambridge, Pennsylvania. The defendants-appellees are Pennware Theatre Corporation, formerly lessee of the Penn Theatre and later owner and operator of the State Theatre, also in Ambridge; A. N. Notopoulos and Paramount Pictures, Inc., each owning fifty per cent of the Pennware stock; R. K. O. Radio Pictures, Inc., Loew's, Inc., Twentieth Century-Fox Film Corporation and Paramount Film Distributing Corporation, producers, distributors and exhibitors of motion pictures. It is alleged that the appellees conspired to deprive the Penn Theatre of showing first run pictures as it had been doing for some years previously. The case was partly heard below by Judge Schoonmaker, who died before the case was completed. The trial was finished before the succeeding Judge under a stipulation which provided that "all proceedings before Judge Schoonmaker * * * shall be deemed to have been before such assigned Judge." The succeeding judge found no conspiracy. This appeal is from his decree dismissing the complaint.

■ Appellees urge that under Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, we should not set aside the findings of fact of the court below unless clearly erroneous. The same rule provides that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses * * *", but it is to be remembered that half the witnesses, presenting the main portion of plaintiff's case, had been heard by Judge Schoonmaker. Nor does the rule operate "to entrench with like finality the inferences or conclusions drawn by the trial court from its fact findings." Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 119 F.2d 704, 705. Finally, if the mass buying power of appellees[2] was unlawfully employed, then, under the particular facts, the findings were not only inade-

1 Sherman Anti-Trust Act, Act of July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C. A. §§ 1–7, 15 note. Clayton Act, Act of October 15, 1914, c. 323, 38 Stat. 730, 15 U.S.C.A. §§ 12–27.

2 Unquestionably here involved even if each distributor were assumed to have acted independently of the others as the court below found.

quate but erroneous. United States v. Griffith, 68 S.Ct. 941, 946, 947.

In August of 1943, appellant for himself and his family group purchased the Penn Theatre. At the time, Pennware was lessee thereof, its lease expiring on April 30, 1944. Pennware's capital stock was owned one-half by Atlantic States Theatre Corporation, a wholly owned subsidiary of Paramount Pictures, Inc., and one-half by A. N. Notopoulos, who operates a chain of motion picture theatres in the area. For at least the ten years preceding the expiration of the lease, Pennware had been licensed to exhibit all of Paramount Film Distributing Corporation's feature motion pictures first run at the Penn Theatre and one-half of the feature motion pictures first run of R. K. O., Loew's and Twentieth Century-Fox. Negotiations for renewal of the lease failed to produce an agreement between the parties and the lease was not renewed. Meanwhile Pennware was busy reconverting a garage property into a theatre which was thereafter named the State.

Pennware had vacated the Penn Theatre by April 30, 1944. Under its lease it was entitled to remove its furnishings and equipment. Appellant contends that in doing this Pennware deliberately did what it could—which is said to have been considerable—to wreck the theatre. While the negotiations for the renewal of the lease were proceeding, appellant talked with Mr. Goldenson, vice president of Paramount Pictures, Inc., in charge of his company's theatre interests. Ball tried to persuade Goldenson that in the event the parties could not agree on a renewal of the lease, it would be unfair for Paramount to move its products from the Penn Theatre or to do anything to get the other film companies to do likewise. According to Ball, Goldenson said that after the Pennware lease was terminated, the product which the Penn Theatre had enjoyed would be given over to the new theatre Paramount, Pennware and Notopoulos were building; none of the first run Paramount product would go to the Penn Theatre unless the lease was renewed; and, as to the other producers, he would use the power of Paramount to see to it that their product went to the new theatre they were building.

Following the termination of the lease with Pennware and the removal by the latter of its property, appellant had his theatre repaired and re-equipped. This was completed by June 23, 1944. He was, however, then or thereafter unable to obtain any first run pictures either from Paramount or from any of the other distributor appellees, and this despite the fact that he was willing to agree to terms which would have been far more favorable to the distributors than those which they had received previously from Penn Theatre showings. All the first run of the pictures of the appellees which, under the Pennware regime, had been displayed at the Penn Theatre was transferred to the State Theatre at the request of Pennware. In such action, according to Finding Number 32 of the District Court, "each distributor acted independently without consulting any other distributor and without concert of action. No representative of Paramount had any active part in obtaining such licenses." And then the District Court found that "In obtaining licenses for first run exhibition of motion pictures in the State Theatre, neither Pennware nor Notopoulos combined or conspired with any of the defendants in restraint of trade or commerce." The Conclusions of Law reiterated this thought.

In so holding we think the lower court failed to accept the clear implications arising from appellees' acts and conduct. " 'The picture of conspiracy as a meeting by twilight of a trio of sinister persons with pointed hats close together belongs to a darker age.' " William Goldman Theatres v. Loew's, Inc., 3 Cir., 150 F.2d 738, 743. As held in that case, conspiracy may be inferred when the concert of action "could not possibly be sheer coincidence". Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." Interstate Circuit, Inc. v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610. That conspiracy cannot be explained away by allegations of "normal processes of competition; * * * theatres * * * less attractive; * * * service

\* \* \* inferior;" or because the new theatre operators are "not as efficient business men as the defendants". United States v. Crescent Amusement Co., 323 U. S. 173, 183, 65 S.Ct. 254, 259, 89 L.Ed. 60. In United States v. Paramount et al., 68 S.Ct. 915, at page 922, the court says: "It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." Most of the present appellees are among the defendants in the Paramount litigation who are there characterized as having shown a "proclivity to unlawful conduct." The second of the recent United States Supreme Court opinions in motion picture matters, United States v. Griffith, supra, concerned a chain theatre owner similar to Notopoulos, the court holding that he is legally presumed to be tending toward monopoly if his chain ownership is influential in obtaining business. That case also reiterates that specific intent is not necessary in such a situation as is before us. Says the court, 68 S.Ct. at page 944, "It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements." Schine Chain Theatres v. United States, 68 S.Ct. 947, is the last of the group of motion picture opinions handed down by the Supreme Court on May 3rd last. Petition for clarification was denied on June 1, 1948. Again, the special facts there are not our case, but generally the pattern is very similar, and it is noteworthy that the District Court was specifically sustained "in drawing the inference of unlawful purpose from the ambiguous episodes" in connection with the question of the use of monopoly power. 68 S.Ct. at page 952.[3]

There is the distinction, more apparent than real, that in the Interstate case there were no witnesses to deny plaintiff's allegations. Here the defense witnesses explain their refusal to deal with Ball by saying they preferred to patronize their old and reliable customer Notopoulos, who, as Paramount's partner, incidentally could have been designated as having an even closer relationship to the defense group than that simply of a trustworthy purchaser of their pictures. In any event Ball was ready to meet and better the terms offered by Notopoulos. It is also suggested that the State Theatre had a finer location and more seats. Without going into detail, the question of location is at least arguable. The two theatres were on Merchant Street, the main business thoroughfare of Ambridge, and within a few blocks of each other. The larger seating capacity of the State would hardly appear overwhelming in view of Ball's cash propositions and longer playing time. Appellees urge, as another ground for discarding the Interstate decision, the presence there of an "extraordinary and unexplained unanimity of action by the distributors." The Interstate facts differ considerably from the ones at bar, but it would be difficult to describe more exactly the gravamen of the instant offense than as set out in the above quoted language from appellees' brief.

Appellees suggest that the Goldman opinion has no bearing primarily because half of the pictures of the defendant distributors other than Paramount are shown in the two Warner theatres in Ambridge. This does not affect the illegality of the conspiracy, if conspiracy there be. United States v. E. C. Knight Co., 156 U.S. 1, 16, 15 S.Ct. 249, 39 L.Ed. 325; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 237, 20 S.Ct. 96, 44 L.Ed. 136; United States v. Yellow Cab Co., 332 U.S. 218, 229, 67 S.Ct. 1560, 91 L.Ed. 2010; William Goldman Theatres, Inc. v. Loew's, Inc., supra, 150 F.2d at page 744. They say further that each appellee simply did not know the others were shunning the Penn, and that statement is incredible. They all knew Paramount's vital interest in the State. This was Paramount's ordinary theatre arrangement throughout the United States with which the other distributors

---

[3] And see United States v. Columbia Steel Co. et al., 68 S.Ct. 1107, 1123 which holds: "When a combination through its actual operation results in an unreasonable restraint, intent or purpose may be inferred; even though no unreasonable restraint may be achieved, nevertheless a finding of specific intent to accomplish such an unreasonable restraint may render the actor liable under the Sherman Act."

were constantly dealing. Cf. United States v. Paramount, supra. They, experienced, shrewd business people as they claim to be and as, in fact, they are, had to know the picture bookings and entire situation at the State. Ball's testimony tends to support this when, among other things, he says he informed R. K. O. that the others had declined to sell to him, and he read a letter he states he sent to Fox during the negotiation period informing the latter of Paramount's plan "to cause the run of the product to be taken from the [Penn] Theatre." The record fails to reveal a convincing basis for accepting the actions of appellees as merely an amazing coincidence. The District Judge was unjustified in so explaining it.

There is no serious attempt to distinguish the Crescent Amusement opinion by appellees. Instead they rely on two other decisions, Westway Theatre, Inc. v. Twentieth Century-Fox Film Corporation, D.C. Md., 30 F.Supp. 830, affirmed 4 Cir., 113 F. 2d 932, and Schad v. Fox, 3 Cir., 136 F.2d 991. Westway concerned a peculiarly local situation in Baltimore. It was a suit by an owner of a new theatre. His neighboring competitors sought clearance protection in their already existing contracts with their distributors, and this was allowed. It was held not an unreasonable restraint of trade because it amounted to the protection of existing customers as permitted at common law. No evidence tending to show conspiracy was observed by the court. As seen, the comparison between the matter before us and Westway is neither close nor controlling where, as here, the conspiracy of appellees is so apparent.

While the doctrine of Goldman v. Loew's supra, has superseded any possible inference to the contrary in the Schad decision as the law of this circuit, on its facts the Schad case, which has to do with an isolated exhibitor-distributor agreement, has no bearing here. The Crescent Amusement opinion, supra, 323 U.S. at page 183, 65 S.Ct. at page 259, 89 L.Ed. 60, clearly outlines the distinction, saying: "We may assume that if a single exhibitor launched * * * a plan of economic warfare he would not run afoul of the Sherman Act. But the vice of this undertaking was the combination of several exhibitors in a plan of concerted action."

When an industry is so powerful that it can and actually does refuse to permit the existence of an individual enterprise such as appellant's within its confines (and that's what the shutting off of first runs from Penn probably amounts to) that industry is going beyond its freedom to trade as it chooses. It comes into sharp conflict with the salutary provisions of the Sherman and Clayton Acts. It is acting unlawfully in restraint of trade. We think that is what happened here. The appellees representing all branches of this tremendous industry are engaged in a conspiracy against the appellant that is both horizontal and vertical. Cf. United States v. Paramount, supra. Collaterally, much could be said about the fairness of appellant's own actions, but careful study of these develops no excuse for the stoppage by appellees of Penn Theatre's first runs. The second and third runs tendered were from the evidence unreasonable, and they were themselves part of the violation of the restraint of trade acts. United States v. Paramount, supra.

The decree of the District Court will be reversed and the cause remanded to that court with directions to enter a decree in favor of the appellant and for the injunctive relief presently sought. The amount of appellant's damages and the form of the decree are for the court below.

GOODRICH, Circuit Judge, dissenting.

The reason for this dissent is that the majority does not give the findings of fact made by the Trial Judge the effect which, it seems to me, Rule 52 requires. If those findings are accepted there is nothing to the plaintiff's case. I think on this point there is no dispute among the parties, their counsel, or the members of the Court.

There is no disagreement among us in rejecting the "cloak and dagger" requisites to prove conspiracy. Nor is there any doubt that the fact that this plaintiff failed to get first run pictures from any of the distributors is certainly a circumstance to be considered in the question whether there was an agreement among them to act together to freeze the plaintiff out, or at

least a knowing participation in such a scheme. Nor could I quarrel with the majority's allusion to the Supreme Court opinion in which reference is made to the "proclivity to unlawful conduct" by some of the defendants here. The mistake which it seems to me the majority makes, is to substitute its judgment for that of the Trial Court in saying what conclusions are to be drawn from all the evidence. This is not a case where a plaintiff sets out a set of facts and circumstances and the question is whether they will warrant a finding of conspiracy on the part of the defendants. The defendants fully presented their side of the case which completely contradicts the facts relied upon by the plaintiff. The simple question of fact is whether those witnesses told the truth or whether they lied.

The majority opinion quotes the plaintiff as claiming that one of the defendants, in removing fixtures from the theatre which the plaintiff had bought, maliciously wrecked it. The plaintiff did make that charge, but it was vigorously denied by witnesses who were the very people who did the job and the Trial Court's finding on the point is squarely against the plaintiff. He said: "26. Pennware caused its furnishing and equipment to be removed from the Penn Theatre from April 27, 1944. [sic] to April 30, 1944. The removal was accomplished in a careful and workmanlike manner, without malice, or any intent to delay operation of the Penn Theatre by plaintiff (R. Notopoulos Exhibits Nos. 7–12, and 14–25, R. 1079, 1086, 1116)."

But this is not the only instance in which an important finding is ignored. It is still the law that if one is not engaged in public utility or a similar activity he may pick and choose his customers as he pleases. If one of these defendants decided he did not want to do business on the plaintiff's terms, there was nothing to compel him to do so. Of course, if he agrees with other people not to do business with the plaintiff or knowingly enters into a plan not to do business with the plaintiff, an entirely different kind of question is presented, and if such is found and the subject-matter is interstate commerce there is a violation of the Sherman Act. No one doubts this, least of all the defendants themselves.

Now on this point the Trial Judge made specific, direct, clear, and forthright findings of fact. Here they are:

"32. In licensing Pennware for first run exhibition of motion pictures in the State Theatre, each distributor acted independently without consulting any other distributor and without concert of action. No representative of Paramount had any active part in obtaining such licenses."

"33. In obtaining licenses for first run exhibition of motion pictures in the State Theatre, neither Pennware nor Notopoulos combined or conspired with any of the defendants in restraint of trade or commerce."

"34. Loew's R.K.O. and 20th Century Fox each had knowledge that Paramount Pictures, Inc., had an interest in the Pennware Theatre, but had dealt only with Notopoulos, or his sons in licensing pictures to that theatre. When each of them decided to license the State Theatre, as opposed to the application of plaintiff for the Penn Theatre, it did not know of the intention of the others to license the State Theatre. In concluding to license the Pennware Theatre each considered the fact that that theatre was managed by an experienced exhibitor of moving pictures, whose credit had been good over a number of years, and who had a theatre equally located and considerably larger than the Penn Theatre, and which promised greater revenue, while the Penn Theatre was to be operated by a stranger in Ambridge whose ability and credit was unknown. Neither Loew's, R.K.O., nor 20th Century Fox, in their respective decisions to license the State Theatre were influenced by Paramount Pictures, Inc., or its power in the moving picture industry."

The very able and experienced Trial Judge did not pull these conclusions out of thin air. The defendants took their case seriously. They called top executives of their respective companies and by direct testimony traced the course of dealings in the licensing of motion pictures in general and in particular as to this plaintiff and the former occupant of the Penn Theatre in Ambridge. All that testimony made categorical denials of any arrangement, express or implied, intimation, or understanding among the defendants with regard to selling

or not selling to the plaintiff. A conversation outlined at some length in the majority opinion about how Paramount was alleged to have threatened to use its power to crush the plaintiff was discussed in the defendant's testimony, too. All of the defendants' witnesses say that the words came from the mouth of the plaintiff and that at least one of the witnesses said at the time that the plaintiff was building up, or endeavoring to build up, lawsuit material for himself.

Each defendant-distributor was informed of the other defendant-distributors' conclusion not to furnish first run pictures to the plaintiff, but according to their testimony this information came from the plaintiff himself. Furthermore, it came at a time when their decision not to furnish plaintiff with first run pictures had already been communicated to him. In other words, the testimony which is in the record does not show that one powerful distributor acted with knowledge of what the others had done, but rather supports the conclusion, made by the Trial Judge, that each acted independently and got his information about the others' action from the plaintiff, himself, after his own decision had been made.[1]

The view, stoutly maintained by the defendant-distributors, that each made his own decision with regard to the offerings to be made to the plaintiff, finds corroboration outside the direct testimony of the motion picture officials on this point. For instance, there was ample evidence that Mr. Notopoulos and his Pennware Corporation had been good customers of the various distributors for a good many years. His bills were promptly paid, the kind of theatre run by him through his corporation was a good thing, sales managers thought, for their business. The new theatre which Pennware Corporation occupied following the termination of the lease on the plaintiff's theatre was a larger building than the former building is. There is dispute as to which location was the better. There was no dispute, however, that the distance between the two was short and that the business section of the community was not such as to exhaust anyone in the walking from one end to the other of the whole area.

The above pieces of evidence are not related to prove that the defendants were circumspect in this case and the plaintiff was wrong. That, of course, is not a determining factor. They are cited to show that the case presented a conflict in evidence and that the defendants presented testimony on very vital points. I earnestly urge that where a question is that of the credibility of people who testify in a case it takes a very, very strong set of circumstances to reject a conclusion reached as to truthtelling by the trier of the fact. When his conclusion as to which witnesses

---

[1] Three of the defendant-distributors by oral testimony stated that their decisions to sell to Pennware rather than Ball were made by certain dates which were previous to the time Ball's witnesses had stated they communicated the information as to what the others were going to do to a particular distributor. Friedman, witness for plaintiff, stated that he told the officials of Loew's early in May, 1944. The official to whom Friedman stated that he made the statement denies any knowledge of it. That person, however, says that one of Notopoulos' sons told him in April, 1944, but the testimony of another witness shows that Loew's had reached its decision previous to that after discussing the matter among themselves in January, February, March, and the early part of April, 1944.

As to R. K. O.'s knowledge, Ball said he informed its officials of the others' action in June, 1944, but the officials of R. K. O. stated that the matter had been tentatively settled on April 3, 1944 and on May 8, 1944 the top executives communicated their decision to members of their organization. Twentieth Century-Fox, on the other hand, said that its decision was made on April 17, 1944 and that it had notice of what the others had decided to do only through a letter sent to it by Ball under the date of May 1, 1944.

Plaintiff's testimony attempts to establish that Pennware had an understanding with Paramount that it would take the first run product to State. This agreement, according to plaintiff, was made even before Pennware's lease on the Penn had expired. Paramount, however, says its decision was made on May 17, 1944 and that it was not aware of what the other distributors had done or would do. Under either version we must accept the fact that the Trial Judge found that Paramount made its decision without the knowledge of what the others had done.

to believe and which witnesses not to believe is backed up by circumstances which show that his conclusion is a rational one, it seems to me that so far as a case turns upon questions of fact the answers given to these questions by the trier of the fact should be accepted. We should not substitute a hunch, however judicial, for facts advertently found.