

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-22-2007

# Adams v. Teamsters Local 115

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3680

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Adams v. Teamsters Local 115" (2007). *2007 Decisions.* Paper 1761.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1761

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NON-PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-3680
_____

DON ADAMS; THERESA ADAMS,
Appellants

v.

TEAMSTERS LOCAL 115; KEVIN MCNULTY; MARC A. NARDONE; MARK
HOPKINS; CHARLIE DAVIS; HEATHER L. DIOCSON; NORMA BOTTOMER;
SHARON HOPKINS; NORTON BRAINARD, III; EDWARD G. RENDELL; LYNNE
M. ABRAHAM; JOHN DOE; JANE DOE NOS. 1-99, Certain Unknown Officials,
Employees, and/or Members of the City of Philadelphia Mayor's Office, The District
Attorney's Office and/or Teamsters Local 115, and other entities; THE ESTATE OF
JOHN P. MORRIS; JOHN F. TIMONEY; JUDICIAL WATCH, INC.; PHILADELPHIA
DISTRICT ATTORNEY'S OFFICE; KENNETH J. WOODRING, JR.;
INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 99-cv-04910)
District Judge: The Honorable William H. Yohn, Jr.

_____

Argued October 18, 2006
_____

Before: BRIGHT,[*] Circuit Judge, and OBERDORFER,[**] District Judge, and
RESTANI[***], International Trade Judge

(Filed: January 22, 2007)

Joseph M. Adams, Esq.
Suite 209
200 Highpoint Drive
Chalfont, PA 18914

Earl N. Mayfield III, Esq.
Gura & Day
11350 Random Hills Road
Suite 650
Fairfax, VA 22030

Attorneys for Appellants

Thomas H. Kohn, Esq.
Markowitz & Richman
121 South Broad Street
Suite 1100
Philadelphia, PA 19107

Attorney for Appellee Teamsters Local 115

Jane L. Istvan, Esq.
City of Philadelphia
Law Department
1515 Arch Street, 17th Floor
One Parkway
Philadelphia, PA 19102

---

[*]Honorable Myron H. Bright, Senior Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

[**]Honorable Louis F. Oberdorfer, Senior Judge of the United States District Court for the District of Columbia, sitting by designation.

[***]Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

Peter D. Winebrake, Esq.
Trujillo, Rodriguez & Richards
1717 Arch Street
Suite 3838
Philadelphia, PA 19103

Attorneys for Appellee Edward G. Rendell

Karen A. Brancheau, Esq.
Jennifer M. Albright, Esq.
Office of District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499

Attorneys for Appellee Lynne Abraham

Robert M. Baptiste, Esq.
Baptiste & Wilder
1150 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20036

Attorney for Appellee International Brotherhood of Teamsters

---

OPINION OF THE COURT

---

RESTANI, <u>Judge</u>.

Don and Teresa Adams (collectively "Appellants" or the "Adams") appeal the District Court's dismissal of their Pennsylvania state law civil conspiracy claim against Philadelphia District Attorney Lynne Abraham ("Abraham"), and the District Court's grant of summary judgment against them on their 42 U.S.C. § 1983 claim. The Adams claimed that Philadelphia District Attorney Abraham conspired with former Philadelphia Mayor Edward

3

G. Rendell ("Rendell") and Teamsters Union Local 115 ("Teamsters Local 115") to engage in unlawful acts. The Adams also brought a § 1983 claim against Rendell, Teamsters Local 115, then Secretary-Treasurer of the Teamsters Local 115 John Morris ("Morris"), Morris' former Chief-of-Staff, Kenneth J. Woodring Jr. ("Woodring"), the International Brotherhood of Teamsters, and certain members of Teamsters Local 115 (collectively "Appellees"), alleging that Rendell conspired with the Teamsters to use violence to prevent the Adams from exercising their First Amendment right to free speech. The District Court dismissed the civil conspiracy claim against Abraham for failure to state a claim, and granted summary judgment against the Adams on the § 1983 claim, finding that there was insufficient evidence that Rendell made an agreement with the Teamsters to assault the Adams. We will affirm.

## I. Procedural and Factual Background

The underlying suit arises from events surrounding a political fund-raiser hosted by Rendell and attended by President William Jefferson Clinton in Philadelphia, Pennsylvania, on October 2, 1998. The fund-raiser was held around the time that President Clinton faced the possibility of impeachment. To ensure that the President's reception was positive, Rendell reached out to various community groups and organizations to rally and support President Clinton. Rendell personally placed approximately twenty phone calls to various groups and also had his representatives place another fifty to sixty phone calls.

One of the personal calls made by Rendell was to the then Secretary-Treasurer of Teamsters Local 115, Morris.[1] Rendell describes the call as follows:

---

[1]Morris passed away in April of 2002. He was never deposed.

4

[I told him that] '[t]he President is coming to town.  We want a real good reception for the President.  There may be some demonstrators there.  And we certainly want to in number and in – in loudness.  We want to drown out the demonstrators.'  I told him who I was calling, community groups, clergy, African-American clergy, Democratic groups, other labor members.  And I said 'Can you bring some people to the – to the demonstration?'  I told him the route that the President's car was going to take.  I said, 'Can you, somewhere along that route, bring some people and – and cheer when the President came by?'  I specifically said I didn't want any interaction with the demonstrators.  I said I want this to be extremely peaceful and extremely positive.  I said – I think I recall saying, 'I want this story out of this.  Clinton comes to Philadelphia welcomed by, you know, tens of thousands.'  And that's the story that I wanted.  And I said, so, you know, 'If anybody heckles or taunts, let them do it.'

(Rendell Dep. 114:4–115:6, Jan. 2, 2002.)

In response, Morris instructed Woodring to send a mass e-mail to Teamsters in the Delaware and Pennsylvania area, requesting that they line the route to the fund-raiser to support President Clinton.[2]  (Woodring Decl. ¶ 8, Aug. 13, 2002.)  As a result, a large number of Teamsters rallied outside the fund-raiser, holding signs and wearing t-shirts with the slogan "Teamsters for Clinton."

Also at the rally were groups of individuals protesting President Clinton's visit ("anti-Clinton demonstrators" or "demonstrators").  Some of these demonstrators displayed signs with slogans such as "[r]esign or get impeached," and "liar, pervert, national shame," (J.A. 358, 373), and chanted "[i]mpeach Clinton now," (J.A. 363).  Appellants, siblings Don and Theresa Adams, were among the demonstrators that day.

_____

[2]Paul Rivera of the White House Scheduling Office also contacted Woodring on September 30, 1998, stating that a strong Teamster showing at the Clinton fundraiser would be desirable.

5

The two groups clashed throughout the day, and on one occasion, the encounter became physical. Don Adams recalls that a hat was placed on his head and pulled over his eyes by Morris. Don Adams was then rushed by several members of Teamsters Local 115. Don Adams testifies that they then knocked him down and repeatedly punched and kicked him. To protect her brother, Theresa Adams placed herself between her brother and the Teamsters, thereby sustaining injuries herself. The police separated the parties within thirty seconds to two minutes. Because of the media presence at the rally, the fight was reported widely on local newscasts.

Two days after the incident, Morris spoke to Rendell and expressed his frustration about the negative media coverage that the Teamsters were receiving. Although it is undisputed that there was a conversation between Morris and Rendell that day, there is some dispute as to the content of the conversation. Rendell testified that he told Morris that "[you] ruined what should have been a good show of support for President Clinton, and introduced a total collateral issue to it that detracted from the overwhelmingly warm support the President had in Philadelphia." (Rendell Dep. 11:4–9, June 14, 2002.) Woodring,[3] however, claims that Rendell assured Morris that "nothing is going to happen to these guys," and that there would be no negative consequences for the Teamsters because he "[knew] how these things go."[4] (Woodring Decl. ¶ 14.) Woodring also claims that Rendell proposed that "the

---

[3]At Morris' request, Woodring would often listen in and take notes on Morris' telephone conversations.

[4]Woodring gave different accounts relating to this matter. During his deposition on September 28, 2001, he testified that he did not recall a conversation between Rendell

Teamsters should file private criminal complaints against Don Adams."[5]  (Id.)

Afterwards, one member of Teamsters Local 115 filed a private criminal complaint against Don Adams, claiming that he had punched her in the face at the rally.  Id.  Don Adams was tried and found not guilty.  The Adams also filed private criminal complaints against several members of Teamsters Local 115.  Following an investigation, four members of the Teamsters were criminally charged.[6]  Each individual was charged with two counts of aggravated and simple assault, riot, recklessly endangering another, and criminal conspiracy.  All four pled guilty to two counts of simple assault and one count of criminal conspiracy.  Additionally, two pled guilty to two counts of riot each, and one pled guilty to one count of riot.  Adams v. Teamsters Local 115, No. 99-4910, 2003 U.S. Dist. LEXIS 15477, *14 (E.D. Pa. Aug. 6, 2003).

On October 4, 1999, the Adams filed the instant suit alleging federal civil rights and Pennsylvania tort claims against Appellees in the United States District Court for the Eastern

---

and Morris.  (Woodring Dep. 275:9–14, Sept. 28, 2001.)  Then, in an affidavit dated August 13, 2002, after the close of discovery and after Morris' death, he described the conversation as stated above.

[5]On the same day of Morris' conversation with Rendell, Rendell's Deputy Mayor for Communications, Kevin Feeley ("Feeley"), spoke to a reporter, saying that although the incident was "unfortunate," and the administration "does not condone" the actions of the Teamsters, "the anti-Clinton groups chose to make their views known.  They chose to make their views known in the face of the Teamsters.  That . . . is generally not a good career move."  (Feeley Dep. 76:16–77:5, Mar. 27, 2002.)  Feeley testified that Rendell was unhappy with Feeley's statement.  (Id. at 99:21–22.)  Feeley also later stated that he meant the comment as a joke.  (Id. at 99:13–15.)

[6]Morris was not criminally charged.

7

District of Pennsylvania. As stated previously, the Adams included a § 1983 claim alleging that Rendell conspired with the Teamsters to violate their right to free speech, and a civil conspiracy action alleging that District Attorney Abraham conspired with the other Appellees to "engage in unlawful acts." The District Court dismissed the majority of the Adams' federal and state law claims, including the civil conspiracy claim against Abraham. The District Court did not dismiss the § 1983 claim, but instead gave the Adams leave to file a second amended complaint.

The Adams filed a second amended complaint to clarify specific claims against Rendell and to remove the counts and allegations that had been dismissed. The District Court then granted Appellees' motion for summary judgment against the Adams as to the § 1983 claim, finding that there was insufficient evidence to establish that Rendell had participated in a conspiracy. The District Court dismissed the remaining state law claims without prejudice pursuant to 28 U.S.C. § 1367(c).

The Adams appeal the District Court's grant of summary judgment in favor of the Appellees on the § 1983 claim and the dismissal of the civil conspiracy claim against Abraham.[7]

---

[7]Additionally, the Adams brought claims under 42 U.S.C. §§ 1985(3) and 1986, which the District Court dismissed. Appellants have also challenged these dismissals.

Section 1985(3) prohibits a conspiracy that interferes with civil rights "for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). Meanwhile, "[i]n order to maintain a cause of action under § 1986, the plaintiffs must show the existence of a § 1985 conspiracy." Clark v. Clabaugh, 20 F.3d 1290, 1295 n.5 (3d Cir. 1994). To succeed on a § 1985(3) claim, the Adams must prove that they are a

## II. Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 (2000). We have appellate jurisdiction under 28 U.S.C. § 1291.

Our review of a district court's grant of summary judgment is plenary. Moore v. City of Philadelphia, 461 F.3d 331, 340 (3d Cir. 2006). Summary judgment is appropriate when, after considering the record as a whole, there is no genuine issue of material fact. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In examining the record, we will draw all reasonable inferences in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party. Id. at 251 (quoting Schuylkill & Dauphin Improvement & R.R. Co. v. Munson, 81 U.S. 442, 448 (1872).

We also exercise plenary review over the District Court's grant of a motion to dismiss for failure to state a claim. McDowell v. Del. State Police, 88 F.3d 188, 189 (3d Cir. 1996). We accept the facts alleged in the complaint as true and draw all reasonable inferences from

---

protected class within the meaning of § 1985(3). Aulson v. Blanchard, 83 F.3d 1, 5 (1st Cir. 1996). Appellants had argued that they were members of a class based upon a shared political affiliation.

Appellants now acknowledge that their § 1985 claim is foreclosed by Farber v. City of Paterson, 440 F.3d 131, 143 (3d Cir. 2006), which held "that § 1985(3) does not provide a cause of action for individuals allegedly injured by conspiracies motivated by discriminatory animus directed toward their political affiliation." Letter from Earl N. "Trey" Mayfield, III, Esq., Counsel for Appellants, to the Office of the Clerk, United States Court of Appeals for the Third Circuit (Sept. 24, 2006).

them. Markowitz v. Ne. Land Co., 906 F.2d 100, 103 (3d Cir. 1990). We will affirm the dismissal if it is certain that no relief can be granted under any set of facts that could be proven. Id.

### III. Discussion

As previously stated, the Adams challenge the District Court's grant of summary judgment against them on the § 1983 claim, arguing that there is sufficient evidence of a conspiracy between Rendell and the Teamsters to violate the free speech rights of anti-Clinton demonstrators by assaulting them. The Adams also challenge the District Court's dismissal of the civil conspiracy claim against Abraham, arguing that they had made a sufficient pleading to survive a Rule 12(b)(6) motion. We disagree with the Adams on both counts.

### A. The Adams failed to present sufficient evidence of a conspiracy between Rendell and members of Teamsters Local 115.

To establish a § 1983 claim,[8] a plaintiff must show that the defendant "deprived him of [a] constitutional right 'under color of any statute, ordinance, regulation, custom, or usage,

---

[8]42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States of other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

of any State or Territory.'" Adickes v. S. H. Kress & Co., 398 U.S. 144, 150 (1970). If there is no action under the color of law, there is no liability under § 1983. Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995) (citing Versarge v. Twp. of Clinton, N.J., 984 F.2d 1359, 1363 (3d Cir. 1993)).

A defendant acts under color of state law "if . . . there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974)). A plaintiff may show such a nexus by establishing that the state and a private actor conspired with one another to violate an individual's rights. Adickes, 398 U.S. at 152. In this event, a plaintiff must allege and prove the elements of a civil conspiracy. See Melo v. Hafer, 912 F.2d 628, 638 n.11 (3d Cir. 1990) (citing Hampton v. Hanrahan, 600 F.2d 600, 620–21 (7th Cir. 1979), rev'd in part on other grounds, 446 U.S. 754 (1980)).

A civil conspiracy is "'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" Hampton, 600 F.2d at 620–21 (quoting Rotermund v. U.S. Steel Corp., 474 F.2d 1139 (8th Cir. 1973) (quotation marks omitted)). This agreement can be shown by direct or circumstantial evidence. See Ball v. Paramount Pictures, 169 F.2d 317, 319–20 (3d Cir. 1948) (holding that a "conspiracy may be inferred when the concert of action 'could not possibly be sheer coincidence'").

11

Here, because the Adams allege that the physical beating, and not the noise, by members of Teamsters Local 115 interfered with their right to free speech,[9] we focus on whether Rendell made an agreement with the Teamsters to use physical violence to interfere with the speech of anti-Clinton demonstrators. (Appellants' Br. 26–27.) The Adams argue that Rendell's testimony, the conduct of the city employees, and Woodring's testimony demonstrate the existence of an agreement between Rendell and members of Teamster Local 115 to violate the rights of anti-Clinton demonstrators by assaulting them. None of this evidence, however, shows any such agreement.

The Adams allege that the conspiracy began with Rendell's phone call to Morris requesting the members of Teamsters Local 115 to attend the rally. The Adams argue that this invitation essentially amounted to an implicit agreement to assault anti-Clinton demonstrators because of "Local 115's well-known history of violence." (Appellants' Br. 33.) The Adams have not pointed to any evidence that would allow a jury to draw such an inference. As stated previously, Rendell explained that he had called Morris to ask him to "[c]ome on down. Line the route . . . cheer the President" because he wanted to ensure "a big and friendly turnout for the President." (Rendell Dep. 112:5–6, 21–22, Jan. 2, 2002.) Rendell stated that he wanted "in number and in [] loudness . . . to drown out the demonstrators," (id. at 114:9–10), but that he "didn't want any interaction with the demonstrators," (id. at 114:20–21), and that "if there are demonstrators or hecklers, let them

[9]The Adams counsel confirmed at oral argument that the Adams' were not complaining that their speech was "drowned out" by noise from the Teamsters.

12

be," (id. at 115:16–18). He also emphasized that he wanted the event "to be extremely peaceful and extremely positive." (Id. at 114:22–23.)

Rendell further stated that he did not anticipate that there would be any violence at the event, (id. at 116:13–20, 121:15–17, 122:5–7), and that he did not know that the Teamsters would become violent, (id. at 119:19–22). Although Rendell admitted to being aware that the Teamsters "get most emotional about . . . strikes and picket lines and replacement workers" and might become violent "in that type of situation," Rendell specifically stated that he "had never seen them or had any knowledge of them getting involved in violence in a political sense." (Id. at 119:9–22.) In fact, Rendell recounted that the Teamsters "had done political picketing and demonstrating, including against [Rendell]" but had never been involved in violence in those situations. (Id. at 118:15–17.) There is simply nothing in Rendell's testimony from which a rational jury can infer that he had either an explicit or implicit agreement with the Teamsters to have them assault anti-Clinton demonstrators.[10]

The behavior of the city police officers at the rally also does not indicate that an illicit agreement existed. The deposed police officers stated that they were not aware of any communication from Rendell to the Philadelphia police department instructing them to treat

---

[10]While Feeley's post-rally comment might suggest that the Teamsters have engaged in violence previously, the comment does not contradict or add anything to Rendell's testimony. Rendell's knowledge of previous Teamster violence in connection with union activities would support a conclusion that violence was expected in that context. Feeley's comment, however, does not imply that Rendell had made an agreement prior to the rally to use force to violate the rights of anti-Clinton demonstrators. Rather, Feeley testified that when he made the unauthorized comments, he did not know that Rendell had invited the Teamsters to the event. Adams, 2003 U.S. Dist. LEXIS 15477, at *28 n.24.

any particular protest group in a different manner. (Boyle Dep. 15:19–21, 23:2–14, 31:7–32:5, 45:18–46:3, Feb. 5, 2002; Mitchell Dep. 23:3–10, 27:11–28:16, Feb. 5, 2002; McLaughlin Dep. 58:16–19, Feb. 15, 2002.) Rather, the officers testified that the rally was handled according to the proper procedures. (Boyle Dep. 26:20–27:7, 31:14–20; Mitchell Dep. 19:7–20; McLaughlin Dep. 24:11–23, 41:10–42:2.)

Woodring's description of Morris' post-rally conversation with Rendell also does not suggest that Rendell had a prior agreement with the Teamsters to assault anti-Clinton demonstrators. In his declaration, Woodring claimed that Rendell and Morris spoke after the rally and that Rendell told Morris that "nothing is going to happen to [those] guys" that were videotaped attacking the Adams. (Woodring Decl. ¶ 14.) Woodring also claimed that Rendell promised to send Police Commissioner Timoney to Local 115 headquarters to interview Teamster members, and that Rendell suggested that the Teamsters should file private criminal complaints against Don Adams. (Id.) For purposes of this appeal, we assume that a jury would have before it testimony consistent with the Woodring declaration,[11] but there is nothing in that description of the conversation that contradicts Rendell's testimony that he had not made any agreement prior to the rally for the Teamsters to assault anti-Clinton demonstrators. Woodring did not state that Rendell admitted to any such agreement or that Rendell apologized to Morris for allegedly involving him in any illicit scheme. Even if we view the post-rally conversation as Rendell consoling Morris for the negative media coverage of the Teamsters, such action does not indicate that Rendell had a

---

[11]See supra n.4.

14

prior agreement with the Teamsters to assault any demonstrators.

Furthermore, the actions taken after the rally do not demonstrate that there was any prior agreement between Rendell and the Teamsters to assault demonstrators, or any later agreement to "whitewash" the actions of the Teamsters at the rally. The police officers who investigated the Teamsters' actions specifically stated that they did so without any influence from Rendell or his office. (Motto Dep. 242:4–244:24, Dec. 6, 2001; Pagliaccetti Dep. 172:6–174:8, Mar. 18, 2002.) An officer also stated that he was not aware of any instruction from the Mayor's office to "whitewash" the Teamsters' involvement in the incident. (Mitchell Dep. 18:8–17.) Finally, Assistant District Attorney Bruce Sagel stated that Rendell did not try to influence his prosecutorial decision-making in any way. (Sagel Dep. 337:8–339:15, Mar. 21, 2002.)

Significantly, four Teamsters were prosecuted and convicted for their actions at the rally. Although Morris was not one of the Teamsters prosecuted, Sagel explained that it was because Don Adams had failed to provide him with any information establishing a "causal nexus" between Morris and the Teamsters who assaulted the Adams. (Id. at 334:15–335:18.) Thus, the prosecutions that occurred after the incident also do not reflect the existence of any conspiracy between Rendell and the Teamsters.[12]

In sum, there is no evidence sufficient to establish the existence of any conspiracy between Rendell and any members of the Teamsters. There is no evidence, whether direct

---

[12]The fact that Don Adams was prosecuted after an individual filed a private criminal complaint against him does not demonstrate that Rendell and the Teamsters had an agreement to assault anti-Clinton demonstrators.

15

or circumstantial, upon which a jury can reasonably infer that Rendell made an agreement to violate the rights of anti-Clinton demonstrators by having them assaulting. Thus, because the Adams failed to show state action through Rendell's participation in a conspiracy to use violence against demonstrators, the § 1983 claim fails.[13]

**B.     The Adams failed to state a civil conspiracy claim against Abraham.**

In addition to the § 1983 claim, the Adams also claim that Abraham conspired with Rendell and the Teamsters to engage in unlawful acts. As the District Court concluded, the Adams did not sufficiently state a civil conspiracy claim.

The sufficiency of a claim for civil conspiracy under state law, brought in federal court, is governed by the Federal Rules of Civil Procedure. See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 926 (9th Cir. 2001) (viewing a state law claim brought in federal court under federal pleading standards); Simmons v. City of Philadelphia, 947 F.2d 1042, 1085 (3d Cir. 1991). Among these is Rule 8, which requires a plaintiff to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). We have held that conclusory allegations of "concerted action," without allegations of fact that reflect joint action, are insufficient to meet this requirement. Lynn v. Christner, 184 F. App'x 180, 184 (3d Cir. 2006) (quoting Abbott v. Latshaw, 164 F.3d 141, 148 (3d Cir. 1998)). Rather, to satisfy the requirements of Rule 8(a), the Adams'

---

[13]Contrary to the Adams' argument, Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685 (3d Cir. 1993), is not applicable to this case. In Parkway Garage, the actions of city officials that were contrary to established procedures were circumstantial evidence of the Mayor's improper motive. Id. at 696–700. As stated, in this case, there is no evidence that any government officials acted improperly.

complaint must allege "at least some facts which could, if proven, permit a reasonable inference of a conspiracy to be drawn." Durham v. City and County of Erie, 171 F. App'x 412, 415 (3d Cir. 2006) (citing Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005)). "This requirement is established where the complaint sets forth a valid legal theory and it adequately states the conduct, time, place, and persons responsible." Lynn, 184 F. App'x at 185 (citing Evancho, 423 F.3d at 353).

Here, in Count XII of their Amended Complaint, the Adams allege that Abraham conspired with the other Appellees "to engage in the unlawful acts set forth above." (Am. Compl. ¶ 145.) Incorporated in Count XII are additional allegations that Abraham made false statements to a local Jewish women's organization by stating that Don Adams "was hitting women." (Am. Compl. ¶ 64.) The Adams also allege that "Local 115, Morris, Dioscon [sic], Sharon Hopkins and Nardone conspired with and/or reached an explicit and/or implicit understanding with Defendant Abraham and the Philadelphia District Attorney's Office to wrongfully prosecute and try . . . Don Adams." (Am. Compl. ¶ 91.) These allegations are insufficient to state a claim for civil conspiracy.

Taken by itself, paragraph 145 is a purely conclusory allegation that does not provide any facts that would permit a reasonable inference that Abraham conspired with any of the Appellees. The other allegations contained in the Amended Complaint, which are incorporated into Count XII, fail to remedy this deficiency. Paragraph 64 alleges that Abraham published false statements about Don Adams, with the apparent implication that the false statements were the result of a conspiracy. Even if Abraham did make the

17

statements about Don Adams, the Adams have not alleged any facts to support an inference that Abraham made the statements because she was involved in a conspiracy. Similarly, the allegations in paragraph 91 assert that the prosecution of Don Adams was due to a conspiracy simply because Abraham prosecuted Don Adams following the receipt of a private criminal complaint. Again, the allegation does not provide any facts regarding the time, place, or conduct of the alleged conspiracy. It is a conclusory statement that is insufficient to meet the Adams' burden to state a claim for relief.

In sum, the Adams did not allege any factual basis that would permit a jury to draw a reasonable inference that any conspiracy existed. Abraham's brief correctly notes that "[w]hile the pleading standard under Rule 8 is a liberal one, mere incantation of the words 'conspiracy' or 'acted in concert' does not talismanically satisfy the Rule's requirements." Loftus v. Se. Penn. Transp. Auth., 843 F. Supp. 981, 987 (E.D. Pa. 1994). Accordingly, the district court properly dismissed the civil conspiracy claim against Abraham for failure to state a claim.

**CONCLUSION**

For the foregoing reasons, we hold that the District Court properly granted summary judgment in favor of the Appellees on the Adams' § 1983 claim and properly dismissed the Adams' civil conspiracy claim against Abraham. Accordingly, we will AFFIRM the orders of the District Court.

**Oberdorfer, J., concurring**.

Defendant Rendell testified in his deposition that he asked Morris, the local Teamsters leader, if he could "bring some people to the – to the demonstration?" in support of President Clinton. "We want," he said "in number and . . . in loudness . . . to drown out the demonstrators" against the President. (Rendell Dep. 114:7-10, Jan. 2, 2002.)

A dictionary definition of "drown out" is: "to cause (a sound) not to be heard by making a loud noise <his speech was [drown]ed out by . . . boos – *New Yorker*>." Webster's New Collegiate Dictionary (1977); *see also* Merriam-Webster's Collegiate Dictionary (10th ed. 1999).

As an original matter I would have directed the trial court to put to a jury the question of whether the defendant was asking Morris to interfere with Clinton opponents' First Amendment right to express publicly their opposition to the President.

However, plaintiffs' briefs failed to make this point, and, at oral argument, plaintiffs' counsel specifically declined to make such a claim. *See* Maj. Op. at n.9.

Accordingly, I must concur in the court's decision.